We begin with Nelson v. Commissioner of Internal Revenue, Mr. Masso. Good morning, Your Honors. May it please the Court, my name is Jad Masso and I represent the taxpayers, Mary Pat and James Nelson. The tax court's opinion regarding the effect of the defined value clauses in these assignments was wrong for at least two reasons that I'd like to discuss this morning. Number one, it relies on post-gift occurrences to measure the quantity of partnership interests that were transferred on the assignment dates rather than the defined or stated values in the assignments themselves. That was wrong because this Court held in McCord that post-gift occurrences do not affect and may not be considered in the valuation of a gift. The second reason is that even if we could consider post-gift occurrences, the language of the assignments in this case required that appraisal to be done within a fixed period. That fixed period was 90 days in the case of the gift or 180 days in the case of the sale, and no such appraisal occurred. As a result, the default fair market valuation for purposes of gift tax that provided by the Code and the applicable regulations would control. And what are the post-gift occurrences that you claim the Commissioner relies on? There was an appraisal committed that was done nine months after the assignments by which an appraiser hired by the donors did an assessment. He was hired to value a 1% interest in the partnership, the purpose of that being to allow them to translate the dollar amount of the transfers into a percentage for purposes of the company's books so that they could actually keep track of who owned what. He did that, and that is where those percentages came from. That was the post-gift event that the Tax Court relied on. Now, the government stipulated in this case that the transfers were complete on the assignment date. That was the end of December 2008 and January 2, 2009. This Court in McCord announced, or at least recognized, the immutable maxim that post-gift occurrences do not affect, cannot be considered in the appraisal and valuation process. So the first issue we have is that the Tax Court relied on that nine-month subsequent appraisal to determine whether or not the appraisal was valid. It relied on the government to adopt percentages and then apply its own valuation to those percentages rather than looking to the documents themselves. Essentially, the Tax Court made the same error that this Court recognized and rejected in McCord and held that that methodology was improper. In McCord, the Court told us that knowing the values of the transfers is enough, that an asset, a transfer, can be measured by a value. We don't have to know the percentage in order for that transfer to be effective. And as the Court said in McCord, the Tax Court in this case should have stopped with the assignment agreement's plain wording. Do I understand your position that what should have happened is that the number of shares would have been retroactively adjusted so that the value stayed below whatever the threshold was for the gift tax? Well, adjustment, not to quibble with your wording, but I think we can correct the percentage, and that's what happened in this case. There was a dollar value that was transferred. There was an appraisal that was done to try to translate that to a percentage. Ultimately, there was a review by the IRS, as of course they're entitled to do, and they said, no, your percentages are wrong. You didn't transfer 65 percent. You transferred 55 percent. And if so, we can correct the allocation on our company books and records, just like was done in the Wandry case, where they said that you can look back and say that the transfer is complete and is based on the dollar values. So that would, just following up on my question, I'm trying to understand, that would then affect the number of shares? It would correct the number of shares in the book. So if we initially thought we'd transferred 65 percent, but in fact we'd only transferred 55 percent, we would go back and make that correction. Another way of thinking about this, Your Honor, that's been helpful to me is that an asset, any asset, can be measured in different ways. You can measure an asset by the percentage of a whole, which is easy to think about when we're talking about an interest in a business. A physical, a tangible asset could be measured by volume or by weight. What McCord and Wandry have recognized is that you can also measure an asset by a dollar value, and that's fair and that is appropriate under the tax code. And so in this case, that's exactly what was done, just as it was done in McCord and in Wandry. We measured the asset. We measured our transfer by a dollar value. For obvious practical reasons, later on, that dollar value had to be translated into a percentage. We may have gotten it wrong. Mr. Schroed may have gotten it wrong, and the IRS may have corrected us. But that doesn't change the transfer itself, which was for a dollar value amount. That was our measurement. There are other ways of measuring, but in this case, the transfer relied on a dollar value measurement. The second point that I'd like to address is that even if we could give effect, setting aside McCord for the moment, if we could give effect to post-gift events to determine the quantum of a gift or the quantum of a transfer, it couldn't have been considered in this case because, as the tax court recognized, the appraisal that was to be performed had to be performed within a fixed period. A fixed period was 90 days or 180 days. And the appraisal in this case didn't occur for more than 240-some days. In essence, with the government trying to rely on that provision, those few words, determined by the appraiser, they're sort of trying to have their cake and eat it, too. They like the first part of the sentence, but not the latter part of the sentence. They want to give effect to as determined by our appraiser, but not as determined by our appraiser within 180 days. They can't pick and choose which parts of the sentence they get to apply. So if they want to hang us on those specific words, they need to give effect to the whole sentence, which means that if we're going to rely on that appraisal, if we could even under the law rely on that appraisal, it had to have been done within 90 days for the gift or within 180 days for the sale, and it simply wasn't done. The benchmark, and they like to talk about we selected the benchmark, if we assume that we did select the benchmark, it didn't happen. It didn't happen. And under those circumstances, we fall back to what does the statute require? Well, our assignment refers to and measures the gift by its fair market value. The tax code, the regulations define fair market value. We know how we reach that. That is fair market value for gift tax purposes. With my remaining time, I'll touch on a couple of other points raised by the briefs. One is this issue of whether the donors, the Nelsons, kept a retained interest, or if there was some sort of savings clause that would invalidate these, some sort of reversion. The government briefed this extensively and seemingly in response to an argument that we did not make. We have never claimed that there was a reversionary interest. We have never claimed, whether on our briefs or otherwise, that Mary Pat Nelson, the donor in this case, had a right to require a return of interest if a subsequent appraisal or a tax court valuation required it. There's nothing like that in any of our briefs or otherwise. And in fact, the argument that there was a retained interest is belied by the language of the documents themselves. There is no provision in these assignments that would allow a reversion like there was in some of these other cases that they cite, where there is, for example, a life estate or some opportunity for there to be a return. Just as in the Wandry case, fixed amounts here were transferred. It is inconsequential that corrections were made to the corporate books later. I think it was explained in Wandry very eloquently. It is the facts and circumstances of the transfer that determine what is recorded in the corporate books. It is not the corporate books that determine what the transfer was. So a correction to those corporate books is inconsequential. We look to the assignment itself to determine what was transferred. Finally, there was some discussion about intent, about surrounding facts and circumstances. We provided some briefing and some information in our brief about the evidence of the circumstances surrounding this, if only to demonstrate the purpose, the reason why. You know, that $2,096,000, that's an odd number. Why did you pick that number? Well, there are very specific reasons, and I'll get to that in a moment. The government argues that subjective intent, you don't get considerate subjective intent, and that's fine. We're not arguing subjective intent. What the regulations and the law allow is that, and this is exactly from the regulations, and I'll give the site, it's in the briefs, but this is 26 CFR Section 25.2511-1G1, that the application of a tax is based on the objective facts of the transfer and the circumstances under which it's made. So no, we don't get to consider subjective intent, but the facts and circumstances surrounding the transaction do matter, and we do get to look at that in considering the meaning. It can illuminate the reasons for why we would interpret this the way it is written. And here, those amounts, that $2,096,000, was very carefully chosen as part of the donor's estate planning process. They were using up the exemption and exclusion amounts available to them, $1,000,000 each for each of the two donors, plus the annual exemptions for the annual transfers that they could have made. That number was very carefully chosen. They expressed it in dollars for the simple reason that they wanted to take advantage of that statutory exclusion that Congress allowed them. Allowing later adjustments, as the government would have us believe, if later adjustments could be made to that, it would defeat the purpose of setting them up this way in the first place. It would defeat the purpose of the assignments being for a specific dollar value amount. But if your clients had an intent, but the tax court determined that the documents, the wording of the documents, reflected something different, doesn't the wording of the documents prevail? We can't use the surrounding facts and circumstances to change what the documents say. I agree with you, Judge Haynes. We can't use it to say that the document means something completely different. But I think in this case, where we've got the documents, that I think have a plain and unambiguous meaning, we can look at the surrounding facts and circumstances to understand why it was done and if nothing else, give us some comfort that we're giving it right. And even if we are concerned that there's, for example, a latent ambiguity, I think that was discussed at one point. You've got this provision in there that says, okay, you're going to value it within so many days, and that didn't happen. Okay, well, so how do we value it? If that creates an ambiguity, and I don't think it does, but let's play devil's advocate for a moment and say that it does create an ambiguity, then we can look to all of the objective manifestations of the donor's intent. And I do mean objective manifestations, not just their subjective intent. And the biggest objective you're focusing on is that weird number of 2,096,000 la-dee-doo. That was the exemption that was available. They wanted to take advantage of it. I mean, you're focusing on the fact that that's an odd number. Normally, if I was going to be running around giving millions in gifts, probably it wouldn't be this very strange number. Fair. That's right. Not that I have millions to give. I wish you did. But nonetheless, it was part of their estate planning process. That was the testimony. That was the explanation given for, look, this isn't just a number we picked out of the sky. These are the legal exemptions we're entitled to. We would like to take advantage of them. And so that's why they were chosen. And they were expressed in dollar amounts for that reason rather than trying to, you know, they could have, I suppose, ballparked a percentage to say we're going to give 50 percent of our business away and hope that comes in under the limit and hope it maximizes it out but not too close. But they didn't want to do that. They wanted to take advantage of the statutory exemption. So that's why they chose it. And I think that eliminates that circumstance. If you were writing the opinion in this case, how would you construe the appraisal portion of the document? I would say that the appraisal portion was for purposes of translating that dollar amount to be used in the corporate books and management and so forth, which is what happened. But that because the IRS can always review, transfers are always subject to review and evaluation by the IRS and by the courts to determine if there is a gift tax deficiency. And so if there was that sort of review, then analysis can be done of was that valuation fair? Did they really transfer 65 percent or did they really transfer 55 percent? And if it's 55 percent, then there's a correction to the books just like there was in Wandry, just like the court recognized that there could be in McCord. We'll correct those and recognize that the transfer was for only that percentage in the translation. But the point is that we don't change what the gift was based on the subsequent events. The gift was what it was. You can measure it in dollars, and we measured it in dollars. And the nine-month, I mean, second to that, of course, is that nine-month appraisal. So if our gift is dependent and is going to be determined by that, it didn't happen within the 180 days. And so it's sort of a nullity as far as if you're going to even argue that it is somehow determinative of what the gift should have been. It can't be in this case because it was too late. Unless there's further questions. You've saved time for rebuttal. Thank you. I've saved time for rebuttal. Yes, Your Honor. Mr. Rennie. Good morning, Your Honors. Douglas Rennie for the Commissioner. Your Honors, as we've heard, the parties in this case agree that the transfers Mary Nelson made to the trust were complete and irrevocable as of the date of the agreements. We've also heard that the taxpayers agree that Mary Nelson retained no interest after the transfer. And they've acknowledged that the clauses here do not contain any language allowing Mary to take back any part of the transfers. So in other words, we have gifts that were complete, irrevocable, no retained interest, and no clause allowing Mary Nelson to take any part of it back or otherwise recall part of those transfers. But what do you do with the fact that it's pretty obvious they were trying to stay within the sort of congressional exceptions to the gift taxes with this $2,096,000 particularly? I mean $20 million maybe is more, I don't know. That's correct. It's rounded, but $2,096,000 doesn't strike me as a rounded gift, the kind of gift, you know, you don't go get a gift card for $96 or something typically. Yes. So, explain. Yes, they did choose those numbers. They do add up to the exclusions, but they left this determination up to a qualified appraiser in these agreements. And that's something that they never really addressed, the fact that they left that determination up to the appraiser. That was their chosen benchmark, and they're essentially attempting to read it out of the agreements. But what do you do with the fact that the appraiser didn't do it within the days set out? Right. Well, they seem to be saying this terminates the benchmark that they chose, but the fact is they used that benchmark in their agreements when they were interpreting their own agreements that they wrote. They didn't seem to think there was any problem with that when they translated those figures into not only their tax reporting documents, the gift tax forms, the partnership forms, but also the partnership agreements, the distributions they made to the various other parties. And one other thing I should mention about that is we did assert that they waived this argument in a brief, and they did come back and refer to two sentences in their post-trial simultaneous answering brief, which by my count this was made on the 155th of 164 pages of post-trial briefing, and they did not assert that the clause was void because of the failure to meet that deadline there. We would submit that, as noted in this Court's decision in the Gonzales case, that that's the type of, quote, conclusory barb that is not enough to preserve the issue for appellate review. But I would say the biggest point is they didn't seem to think there was any problem at all with the fact that this was, however many days late, they interpreted their own agreement to say that, yes, we're going to use this appraisal. And they needed some measure to use it. They needed a benchmark because it is not enough to just, if you're going to use a set figure, which is true, you can, but you need some way, some benchmark of value to transfer that into a share that you can then use for all these other purposes. But under your theory, they never really can do that because they can get an appraiser who does a good job, but then the IRS can disagree and some judge down the road also finds differently. And then, boom, they owe all these taxes. It is possible, Your Honor. There are ways to structure it, as took place in the McCord decision, where if you have a situation where you're not trying to have the taxpayer take back property or have it reallocated, which creates a problem because the test for a gift is the relinquishment of dominion and control. But if you're not, if you have a situation in McCord where property would be reallocated to a charity or among donees, then you can do that. And the McCord decision was out and published when the taxpayers made this arrangement. They could have followed that type of arrangement, but they chose not to. There are a couple cases that illustrate the point that the language that the parties choose in this type of agreement matters. Among those are cases we cite in our brief, Harwood v. Commissioner and a state of Moore. In particular in Harwood, and that was a published tax court case which was affirmed on appeal, the transfer agreement required the recipient, the trust, to pay the donors back the excess value if there were two conditions. First, a determination that the property's value exceeded a chosen amount. And second, the trustee's attorney concluded that a lower value was not defensible. The taxpayer argued that this clause was equivalent to setting the value of the transfer as determined by the tax court, and that meant no gift tax was owed. The court rejected that argument. It held the clause did not even come into effect because the second half of it was not implicated by the court saying the valuation was wrong. In other words, it refused to read the second half of that clause out of existence. And that's the equivalent of what the tax court did here, where it correctly refused to ignore the fact that they left this determination up to a qualified appraiser. Another case that illustrates this principle is the estate of Moore case. That is a somewhat complicated case in that it had a number of different agreements at work, but the gist of it is that the estate in that case was arguing that the clauses they had there was analogous to the clauses in estate of Christensen and estate of Petter, which used a benchmark of a final determination for federal gift tax purposes. The court disagreed with that. They said, no, you have different language in these agreements that make a reallocation contingent on an audit. So you have different language, you get a different result. And another case that ultimately demonstrates that, of course, is this court's decision in succession of McCord, where this court identified the central problem being that the tax court ignored the terms of the transfer agreement. Now, the taxpayers rely heavily on succession of McCord, Wandry, a number of other cases. We would submit that they're distinguishable here for three key reasons. First, none of them used this qualified appraiser benchmark. They all used variations of the as determined under federal gift tax principles or for federal gift tax purposes. Second, with the exception of Wandry, all the other cases did not involve a situation where property was reverting back to the donor. And this is, again, the issue with the cessation of dominion and control. Once that occurs, the gift is complete. It cannot be transferred back. And that's why we submit that the Wandry decision was wrongly decided. But all these other cases involved a scenario, as in McCord, where the taxpayer was essentially setting up a gift of certain amounts. There was a formula to disperse it. And at some later point, the court said, okay, the valuation was wrong. More property might go to the charity. At the end, maybe there's a greater charitable deduction. But nothing is being returned back to the donor. So that is an issue of why we think that Wandry is wrongly decided. We think that would be a problem here, too. And third, there's a charity involved in all of these cases except Wandry. And that is an issue that some of these courts have found implicate public policy concerns favoring a reallocation and an increased donation to charity. We don't have that situation here. If I could address a few points that came up in the reply brief, the taxpayers mentioned that somehow Mary Nelson, this is on page 4, could have decided not to choose an appraiser because the agreements were sufficiently definite. But, again, that's not possible here. We know they need these percentage shares for multiple other purposes. They need to know who carries the benefits and burdens of ownership. A set dollar value doesn't tell you that. They need to know that in order to know who can control and dispose of the property, what the payment and allocations of dividends are, and, of course, in addition to that, for their books, for tax reporting purposes. Another issue in discussing some of the public policy implications, we noted that the tax court has no power to reallocate shares among the parties in this type of situation. They responded, well, partners have rights under state laws. Partners can sue each other. Mary Nelson could theoretically sue the other partners to get back some of their shares if the valuation was wrong. Of course, we know she wasn't going to do that. The whole point of this was for her to transfer away the shares. And our point was that the IRS has no remedy in this type of situation. Your Honors, if the court has no further questions, I'll just briefly conclude by noting that here the taxpayers were free to structure their affairs as they chose, and they were free to choose the terms of their transfer agreements. But there's no right to a do-over when many years later they've decided that a different arrangement would have been more beneficial to them. The taxpayers should be held to the consequences of their choice. The law and the transfer agreements do not allow them to change the outcome at this late date. Thank you, Your Honors. Thank you, Mr. Rennie. Mr. Masso, you've saved time for rebuttal. Thank you, Your Honors. Just a few points in rebuttal. The government made a few responses to the cases on which we rely, and I'll address each of those. Number one is that we use – that the donors used and relied on the quote-unquote benchmark. He correctly points out that, of course, for practical reasons we did have to assign some percentage. Just as if I had said I'm granting you an interest in 20,000 pounds of – or $20,000 worth of grain or coins or some other asset, you're going to have to quantify that somehow for practical use purposes. And so we did that on our books. But those – that allocation, that translation of dollars into a percentage of the whole is always subject to review by the IRS. It is always subject to review in a court proceeding like this where they say we did it wrong. And so that is not determinative. It doesn't change the amount of the gift that was given on the transfer date when it says we're giving you exactly $2,096,000 worth of this interest. Second, dealing with the reversion or retention issue, the question I have is still the same. Where does it say that in the document? Where does it say if we gave too much, you're going to give us some back so that we don't go over the exemption? It doesn't say that because it doesn't need to. The exemption was $2,096,000, and that's why we gave – the gift was in that amount. The $20 million was a sale, and so it was in exchange for a $20 million note. There was no gift there. The gift amount was exactly the exemption amount. So there was no anticipation that based on some future event it could get revalued, revert back, and cause the amount of the gift to increase to more than $2,096,000. It's simply not contemplated in the agreement, certainly not within the four corners. This issue of the other cases having to do with charities except for WANDRI, of course, we believe WANDRI is not incorrectly decided, naturally, but it doesn't matter because in this case what we're simply recognizing, if the government's valuation is correct, which we concede that the valuation portion of this is fine, so if it was 65% now it's 55%, all we're doing is recognizing that the donor still has more than we initially thought. So in a situation like this, it's not as if the asset is suddenly vanishing and is never going to be susceptible to tax. All we recognize is that the donor has more than we initially thought. She gave less than we initially thought as far as volume, as far as that percentage interest. And so in a situation like this, that asset that she still maintains may well be taxable in the future, whether by gift tax, estate tax, or otherwise. The IRS is not entitled to have a remedy in every case. When there's a reallocation of interest where there needs to be a correction to the books, the partners may wish to pursue that on their own. They each have a right and entitlement to receive their fair distribution based on what the gift actually was. So just because the tax court can't force us to do it doesn't mean that it can't happen. And, in fact, it's been corrected in this case. That was acknowledged in the briefs, that we did go back and correct them based on the tax court's, the valuation that was reached in part of that deal, the settlement that was never finalized with the IRS. Mr. Rennie spoke briefly about policy, and so I'll end on that note. Of course, I touched on the fact that these assets just didn't suddenly disappear. They can still be taxed in the future. But I think more importantly, these are statutory exemptions. Congress created these exemptions for a reason. They created these exclusions for a reason. And they created them in these specific amounts. If we allow the government and the tax court to do what the government advocates for here today, we are thwarting, we are actually impeding the public policy that Congress has created in these exemptions. Taxpayers should be entitled to take advantage of the exemptions, and if they wish to do so, as this court recognized in McCord, to do so by stating a value, by measuring a gift in dollars rather than in percentage or in weight or in volume or whatever. McCord instructs us that we can measure a gift in dollars, and that's all we ask for in this case. So we would ask the court reverse and render judgment that there is no deficiency in the gift tax. Unless there's any further questions. That's all I have. Thank you. Thank you, Mr. Mouser. Your case is under submission. The remaining case for the day, Great American Insurance Company v. Employers Mutual.